Filed 5/16/23  Mondloch v. Bell CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KATHLEEN MONDLOCH (BELL),<br><br>    Appellant,<br><br>        v.<br><br>BETSY BELL,<br><br>    Respondent. | F084407<br><br>(Super. Ct. No. F71486)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Merced County.  Shelly Seymour, Judge.

Cyril Lawrence, Inc. and Cyril L. Lawrence for Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth and Christopher A. Kent for Respondent.

-ooOoo-

---

[*]    Before Franson, Acting P. J., Meehan, J. and Snauffer, J.

Appellant Kathleen Mondloch (Bell) challenges the trial court's award of $57,833 to her daughter, Betsy Bell (daughter), representing a one-sixth interest in the family home that was sold through a short sale in 2011.  Our review of the record provided on appeal, and the relevant legal standards governing the interpretation of the language used in the agreement at issue here, leads us to conclude this matter must be remanded to the trial court for further proceedings.

## PROCEDURAL AND FACTUAL SUMMARY

On February 7, 1984, an interlocutory judgment of dissolution of marriage was entered, with an attached stipulation dividing the community and separate property assets of Mondloch and Jimmie Bell (ex-husband) (hereinafter "1984 property agreement").  Among the property addressed in the 1984 property agreement was the "family" residence (the Mulberry property), which was declared to be Mondloch's sole and separate property as follows:

> "All interest of the parties in the house and lot at 5520 West Mulberry, Atwater, California, subject to the equitable interest of the minor children as more particularly set forth in this judgment."

Later in the 1984 property agreement, this equitable interest designated for the two minor children of the marriage was described this way:

> "One-third of the gross value of the residence at 5520 West Mulberry, Atwater, California, which is awarded to [Mondloch] under the terms of this judgment, with the interest granted herein to be held in trust for the benefit of the minor children under the provisions set forth in the Civil Code of California, with one-half of the principle and accrued income of the trust distributed to each child as she attains the age of twenty-five (25); the interest created herein shall be an equitable interest and shall accrue to the benefit of the minor children upon the sale of the residence, or the death of Petitioner, whichever first occurs; and, [Mondloch] and [ex-husband] shall act as co-trustees with the powers more specifically designated in Section 1120.2 of the Probate Code of California for the purposes of this paragraph, the gross value is defined as the gross sale proceeds of the residence less any costs of sale and real estate commissions."

2.

On July 8, 2021, a request for order was filed to enforce the 1984 property agreement with respect to daughter's interest in the Mulberry property.[1] Daughter is one of the two minors referenced in the 1984 property agreement, and is the real party in interest and respondent here. A hearing on the request for order was held on October 7, 2021.

The first witness at the hearing was Tammy Fornier, an employee of the title company who handled the escrow of a short sale involving the Mulberry property in 2011. Fornier testified that all physical documents involved in the escrow had been shredded approximately seven years after the short sale. However, Fornier was able to retrieve a closing statement for the escrow from a computer. This statement showed Mondloch received nothing from the sale of the Mulberry property, and that the lender took all the proceeds from the short sale. The statement also showed the sale price for the Mulberry property was $177,000, and that the lender received $165,180.15 after commission, taxes, and other closing costs were deducted.

Mondloch testified she continued to live on the Mulberry property, even after remarrying, until sometime in June 2011, when the property was sold in the short sale. Between 1984 and June 2011, Mondloch explained she took out various loans on the Mulberry property to pay for repairs and upkeep, and for other things related to her daughters. Mondloch recalled taking out three separate loans on the Mulberry property during that time. After the first loan, the subsequent loans refinanced whatever debt remained on the property for the prior loan. At the time of the short sale, Mondloch owed over $300,000 on the Mulberry property. In fact, Mondloch acknowledged that the notice of default showed she owed $347,000 on the Mulberry property.[2] According to

---

[1]     The actual request for order is not part of the appellate record.

[2]     Mondloch testified to this fact during the hearing. We were not provided as part of the appellate record the notice of default listing this debt, which was introduced as an exhibit during the hearing.

Mondloch, the bulk of the funds borrowed were used for remodeling and upkeep, explaining that there were three buildings on the one and one-half acre Mulberry property. The funds were used to pay for roofs for each building, painting, and windows. The pool on the property also had to be replastered twice, and a new well was also built. Mondloch admitted that not all these expenses were incurred while her daughters were still living in the home.

Daughter was the next to testify. She acknowledged receiving a $5,000 check from her mother in 2017. Daughter stated that although her mother testified this amount was given to offset the debt owed to daughter under the 1984 property agreement, daughter testified no such statement was made to her at the time the check was provided. Daughter only recalled a discussion that these funds may have been part of a "wedding fund" that had been saved on her behalf by Mondloch, but was now given to her because of her current needs.

Ex-husband testified and explained that although the 1984 property agreement showed there was approximately $111,000 worth of liens against the Mulberry property in 1984, he eventually paid off all this debt near the time of the divorce so Mondloch would receive the home free and clear. It was ex-husband's expectation Mondloch would only be obligated to pay insurance and taxes going forward. Ex-husband further testified he expected his daughters would receive their interest in the Mulberry property once they turned 25 years of age. Ex-husband explained that he did not pursue this matter earlier because of bad advice from a lawyer, but mostly because his daughters objected to that approach.

After obtaining additional briefing on the issue of laches, the trial court entered an order on March 3, 2022. The order stated the 1984 property agreement created an equitable interest for daughter in the Mulberry property, and that she was entitled to one-sixth of any "sale proceeds." After finding no grounds to apply the defense of laches, the court determined:

4.

"[T]he gross sale proceeds from the property [are] equal to what [Mondloch] received over the years by encumbering this property or $347,000, funds she and she alone received because of the equity in this property and used at her discretion to the exclusion of [daughter]."

The court then awarded daughter $57,833, representing one-sixth of the "gross sale proceeds," but declined to award daughter prejudgment interest. In the order, the court did not offset against this award an amount representing the $5,000 check provided to daughter in 2017. A notice of entry of this order was served on March 16, 2022. This appeal followed.

## DISCUSSION

In her appeal, Mondloch challenges the trial court's award of $57,833 to daughter, arguing it is based on an incorrect interpretation of the phrase "gross sale proceeds" in the 1984 property agreement. Mondloch further argues the court improperly denied her defense of laches to the action brought on behalf of daughter to recover her one-sixth interest in the Mulberry property.

### I. The Trial Court's Interpretation of the Phrase "Gross Sale Proceeds"

The trial court in its ruling found daughter was entitled to one-sixth of the sale proceeds for the Mulberry property. The court further found "the gross sale proceeds from the property to be equal to what [Mondloch] received over the years by encumbering this property or $347,000," which meant daughter was owed $57,833. Our resolution of this issue will require us to consider the meaning of language used in the 1984 property agreement.

The standard of review when construing contract language is de novo, "including where conflicting inferences may be drawn from undisputed extrinsic evidence, 'unless the interpretation turns upon the credibility of extrinsic evidence.' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531.) When " ' "competent extrinsic evidence is not in conflict, the appellate court independently construes the contract." ' " (*Ibid.*)

5.

" 'Marital property settlement agreements are favored under California law [citation], and [are] governed by general contract principles [citation].' " (*Welch v. Welch* (2022) 79 Cal.App.5th 283, 296.) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code,[3] § 1636.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (§ 1639.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (§ 1644.)

Again, the 1984 property agreement stated daughters (as the minor children) were entitled to receive one-third of the gross value of the Mulberry property, to be held in trust for their benefit. The gross value was further "defined as the gross sale proceeds … less any costs of sale and real estate commissions." Mondloch and ex-husband were designated as co-trustees of this equitable interest.

In his testimony, ex-husband stated it was always his intent that each daughter receives one-third of any sale proceeds for the Mulberry property. He also believed the agreement required the property be sold by the time his daughters reached the age of 25. We do not find this characterization of the relevant language in the 1984 property agreement to constitute a credible or logical interpretation of the terms used. The language only mentions a one-third interest for "the children," not for each. There is also no requirement stated that the Mulberry property be sold before either daughter turned 25. We will therefore independently construe the language of the 1984 property

---

[3]    Unless otherwise indicated, all further statutory references are to the Civil Code.

agreement on the issue of any obligation owed to daughter related to the Mulberry property.  (See *Hewlett-Packard Co. v. Oracle Corp.*, *supra*, 65 Cal.App.5th at pp. 530–531.)  This will require us to consider the meaning of "gross sale proceeds" as it is used in the 1984 property agreement.

The specific language of the 1984 property agreement states, "gross value is defined as the gross sale proceeds of the residence *less any costs of sale and real estate commissions*."  (Italics added.)  There is no mention in this language that any debts encumbering the property should be factored into the amount before the gross value is identified.  Yet, the trial court determined "the gross sale proceeds from the property" were equal to what Mondloch "received over the years by encumbering this property or $347,000," resulting in an award for daughter of $57,833.  When viewing the plain language of the 1984 property agreement, we cannot conclude that the meaning of "gross sale proceeds" could be interpreted to mean the total value of loans received on the property.[4]

This matter must be remanded to the trial court for a redetermination of what is owed to daughter under the 1984 property agreement, based on a new interpretation of the phrase "gross sale proceeds."[5]

---

[4]  The Merriam Webster online dictionary states "proceeds" is generally understood to mean proceeds before costs and expenses are deducted to determine the net proceeds from a sale that will be provided to a seller.  (Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/gross proceeds> [as of April 20, 2023].)  For federal income tax purposes, "[g]ross proceeds include cash and notes payable to [the transferor or seller], notes assumed by the transferee (buyer), and *any notes paid off at settlement*."  (I.R.S. form 1099-S, rev. 2022, p.4, emphasis added.)  Both of these more common uses of the phrase "gross" or "gross proceeds" identify a starting point, or the total amount paid by the buyer before expenses, costs, or notes are deducted from that amount.

[5]  We do not address any additional claims that may be available to daughter to address potential harm done to her equitable interest in the Mulberry property.

## II.    The Availability of a Laches Defense to Mondloch

" 'Laches is an equitable defense to the enforcement of stale claims.  It may be applied where the complaining party has unreasonably delayed in the enforcement of a right, and where that party has either acquiesced in the adverse party's conduct or where the adverse party has suffered prejudice ….  [Citations.]' " (*Straley v. Gamble* (2013) 217 Cal.App.4th 533, 538.)  "We review the trial court's finding [on the availability of a laches defense] for an abuse of discretion." (*Id*. at p. 537.)

The 1984 property agreement cited Probate Code section 1120.2 as providing guidance for Mondloch and ex-husband in their roles as co-trustees of the equitable interest provided to their daughters.  While that specific provision of the Probate Code was repealed, the language contained in that provision was reenacted into Probate Code sections 16200 et. seq.  Therefore, Mondloch continued to owe her daughters a fiduciary duty to protect the equitable interest they were provided at the time their parents divorced.  (Prob. Code, § 16202.)

A valid trust interest can "be created by any words or acts of the trustor which indicate with 'reasonable certainty' an intention" to create a trust interest, the subject, its purpose, and to designate any beneficiaries of the trust interest.  (*Estate of Berges* (1977) 76 Cal.App.3d 106, 109.)  To that end,

> "An instrument that incorporates the powers provided in former [Probate Code] [s]ection 1120.2 (repealed by [Ch.] 820 of the [Stats.] of 1986) shall be deemed to refer to the powers provided in Article 2 (commencing with [Prob. Code,] [§] 16220).  For this purpose, the trustee's powers under former [Probate Code] [s]ection 1120.2 are not diminished and the trustee is not required to obtain court approval for exercise of a power for which court approval was not required by former law."  (Prob. Code, § 16203.)

While the "grant of a power to a trustee, whether by the trust instrument, by statute, or by the court, does not in itself require or permit the exercise of the power," any exercise of that power "by a trustee is subject to the trustee's fiduciary duties."  (Prob. Code,

§ 16202.)  A trustee also has an ongoing obligation to beneficiaries of trust property. (See *Blackmon v. Hale* (1970) 1 Cal.3d 548, 560.)

Mondloch had an ongoing responsibility to her daughters to take care of the equitable interest owed to them through the 1984 property agreement.  Even if other elements of the test for laches could be established, Mondloch failed to establish how she would be prejudiced by allowing such a claim to go forward, given the high duty she owed as a fiduciary to her daughters.  We find no abuse of discretion in the trial court's denial of Mondloch's claim of laches.

## **DISPOSITION**

This matter is remanded to reconsider the findings made in paragraphs six and seven of the "RULING ON MOTION OF REAL PARTY IN INTEREST, BETSY BELL, TO ENFORCE JUDGMENT," involving the interpretation of the phrase "gross sale proceeds" in the 1984 property agreement.  In all other respects, the order is affirmed.  Costs are not awarded in this appeal.